**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Kenneth Robinson, <u>et al.</u>,      )
                                )
              Plaintiffs,       )  Case No. 1:06-CV-371
                                )
      vs.                       )
                                )
Coca-Cola Enterprises, Inc.,    )
                                )
              Defendant.        )

O R D E R

        This matter is before the Court on motions for summary
judgment filed by Defendant Coca-Cola Enterprises, Inc. (Doc.
Nos. 39, 43, 46, 49 & 56).  For the reasons set forth below,
Defendant's motions are not well-taken and are **DENIED.**

I. <u>Background</u>

        Plaintiffs Kenneth Robinson, Brent McCoy, Cheikh Thiam,
Dante Roe, and Jonathon Frost present claims pursuant to the Ohio
Civil Rights Act, Ohio Rev. Code § 4112.02, <u>et seq.</u>, that they
were subjected to a racially hostile work environment during
their employment with Defendant Coca-Cola Enterprises, Inc.
("CCE") at the Duck Creek and Wilmer Avenue facilities in
Cincinnati.  In its motions, CCE argues that summary judgment in
its favor is appropriate as to each Plaintiff because the work
environment was not severe and pervasive as a matter of law.
Alternatively, CCE argues that summary judgment is appropriate
because it implemented an effective policy against racial

1

harassment and it took adequate measures to promptly correct harassing behavior.  The Court has subject matter jurisdiction in this case because there is diversity of citizenship between the parties and the amount in controversy is in excess of $75,000. Notice of Removal (Doc. No. 1) ¶ 4.

The Court considers in turn the facts relevant to each Plaintiff's claim.

### A. <u>Kenneth Robinson</u>

Plaintiff Kenneth Robinson is African-American. Complaint ¶ 6.  Robinson was employed by CCE from June 23, 1993 to September 27, 2001, when he was terminated for excessive absenteeism.  <u>Id.</u> ¶ 14; Robinson Dep. (Vol. II) at 330.  Robinson was hired as a pallet builder at the Duck Creek facility and subsequently held other positions with CCE.

According to Robinson's deposition testimony, his work environment was racially hostile in the following ways.

Managers and supervisors would repeatedly order African-American employees to get back to work but would not say anything to Caucasian workers who were standing around.  Robinson Dep. (Vol. I) at 14-22.

Robinson was assaulted by a Caucasian employee on one occasion.  According to Robinson, one day he was working as a premix tank washer and Kelly Schneider was assigned to load the line with tanks.  Schneider, however, arrived ten minutes late at

2

the start of the shift, leaving Robinson with no work to do. When Schneider arrived, Robinson pointed to the end of the line and said "something to the extent of . . . we just had a meeting on this." Id. at 48. Robinson testified that Schneider then "erupted" and became very angry. Id. at 49. Robinson approached Schneider's forklift to tell him that he needed to get the tanks on line because "[w]e had just gotten into trouble for this[.]" Id. Schneider said to Robinson, "Nigger, you don't tell me what to do" and reversed his forklift. As he backed away, Robinson's hand hit Schneider's shoulder. Schneider then jumped off the forklift and continued to shout obscenities at Robinson. During this confrontation, Schneider punched Robinson in the neck. Id. at 49-50. Both Robinson and Schneider received three day suspensions for this incident. Robinson's suspension was reduced to one day after he filed a grievance, but he believed that Schneider should have been terminated pursuant to postings which state that fighting is grounds for termination. Id. at 51-64.

In an unrelated incident, Robinson saw Schneider punch another African-American employee, Damian Nolan, in the ribs. Id. at 65-66. Robinson also testified that Schneider used racial slurs on a regular basis. Id. at 339-41. Employees Jim Marshall and Harry Acey used racial slurs regularly too. Id. at 341. According to Robinson, "You had everything - from the N word, to trees, to African, to watermelon, to chicken. That's on a daily

3

basis. It's every day." Id. at 347. "Or go back to Over-the-Rhine." Id. at 348. Robinson stated that African-Americans were constantly referred to as "monkeys" on the warehouse floor. Id. at 372. Robinson said that he saw "black rat" written in the bathroom. It was painted over two days later after he complained. Id. at 371.

Robinson was the victim of pranks at the hands of Caucasian employees. Id. Robinson testified that he would return to his work area to find that his pallet had been dismantled or that product which he had previously loaded was missing. Id. at 80-81. Robinson also testified that he had seen a white employee, Chris Cracium, remove tickets from pallets completed by African-American workers so that the worker would not get credit for completing the pallet. Id. at 79-80. Robinson said that this occurred to a number of African-Americans and that it was a "popular game" among Caucasian warehouse employees. Id. at 89-90.

Robinson testified that he believes that African-American employees were disproportionately suspended or terminated for attendance violations compared to Caucasian employees. Id. at 127-28.

Robinson testified that African-American pallet builders were held to different production standards than Caucasian pallet builders. African-American pallet builders

would be disciplined for not meeting standards and white pallet builders would not. Id. at 84-85.

## B. Brent McCoy

Plaintiff Brent McCoy is African-American. Complaint ¶ 4. McCoy worked for CCE as a temporary employee for approximately seven months before becoming a full-time employee in July 1997. Id. ¶ 15. McCoy started as a checker, ensuring that the pallet builders had filled the customer's order correctly. McCoy Dep. (Vol. I) at 28. McCoy was terminated on July 14, 2003 for insubordination, menacing behavior, failure to abide by a last chance agreement concerning attendance, and falsification of company records. McCoy Dep. (Vol. II) Ex. C. McCoy testified that he was subjected to a racially hostile work environment.

McCoy was also a victim of racial name calling. In 1999 or 2000, an employee named Joe Heyl told McCoy that a Caucasian supervisor, Chuck Peasley, mocked McCoy for bringing doughnuts to work, saying, "[T]hat has to be the most dumbest nigger I know. He brings doughnuts in on Saturdays, but yet he can't even fix his car." Id. at 192. Marshall also called McCoy a "nigger" sometime in 1994 but he did not report the incident. Id. at 199-200; McCoy Dep. (Vol. II) at 149-50. McCoy also said that Peasley would make him clean up the loading dock area, a

5

union job outside of his responsibilities, but would not require Caucasian employees to do this job.  Id. at 178-79; 183.

McCoy was the victim of pranks at work.  McCoy said that supervisor Carl North threw his cigarettes on the ground, poured out his water, and hid his radio.  McCoy Dep. (Vol. II) at 150-51.  Sometimes other employees would take McCoy's chair or throw it off of the loading dock.  Id. at 180.  On another occasion, North told McCoy that the police were looking for him. McCoy was then written up for leaving his work area when he went to see what the police wanted with him.  Id. at 186-87.  McCoy does not believe that North was disciplined for playing pranks on him.  Id. at 204-05.

McCoy was informed about graffiti in the women's restroom and saw "nigger" written in the men's restroom.  Id. at 159-60.  McCoy was also informed that managers and supervisors used the word "nigger" in meetings.  Id. at 160-61.

Additionally, McCoy's testimony suggested that some of the work areas were racially segregated.  For instance, McCoy implied that the back gate of the warehouse was staffed mostly with white checkers and African-American employees were not welcome to transfer there.  McCoy Dep. (Vol. I) at 56, 94.

### C. Cheikh Thiam

Cheikh Thiam is a black African from Senegal. Complaint ¶¶ 7, 9.  Thiam was a seasonal employee with CCE for

6

approximately seven months in 1994.  Thiam Dep. (Vol. I), at 33.
Thiam became a full-time employee of CCE as a relief operator in
April 1999 at the Duck Creek facility.  Id. at 37-38.

     According to Thiam, management personnel treated
African-American employees more rudely than Caucasian employees.
Id. at 104.  Thiam said that managers would never raise their
voices or swear at Caucasian employees like they would to
African-American employees.  Id. at 105-06.  One African-American
supervisor, Duane Smith, called Thiam "a lazy black bastard."
Id. at 127-29.  Thiam also said that Smith talked about his skin
complexion, saying that "he [Smith] never seen someone dark like
me."  Id. at 130.

     Thiam heard from painters about racist graffiti written
on the bathroom walls, including "nigger" and "KKK."  Id. at 146-
47.  Thiam had seen that someone had carved the word "niggers"
into a table in the breakroom.  Thiam Dep. (Vol. II), at 115-16.
Thiam heard a rumor that supervisor John Morgan had threatened to
retaliate against another African-American employee, Jake
Wildstar, for complaining about perceived discrimination.  Id. at
125-27.

### D. Dante Roe

     Plaintiff Dante Roe is African-American.  Complaint ¶
6.  Roe began employment with CCE in November 1997 as a pallet
builder at the Duck Creek facility.  Id. ¶ 17; Roe Dep. (Vol. I),

at 11-13.  Roe claims that he was subjected to a hostile work environment beginning in about March 2002.  Id. at 17-18.

Roe testified that on several occasions that supervisors would pass by groups of idling Caucasian employees without comment but would break up groups of American-American workers and tell them to go back to work.  Id. at 19; 22.  Roe said that on one occasion he received a three day suspension for insubordination, but that another Caucasian employee who in his judgment was also insubordinate only received a written warning. Id. at 21.

Roe became aware that supervisor Steve Kleier had made racist comments.  Specifically, Roe heard that on one occasion between 2002 and 2005 Kleier said, "The only good nigger is one hanging from a tree."  Roe Dep. (Vol. II), at 37.  Roe also heard through the rumor mill that Kleier had called a seasonal employee a "jungle monkey."  Id. at 44-46.  Roe was also aware that a Caucasian forklift operator, Frank Harris, had a reputation as a racist and was prone to "drop[ping] 'N' bombs on different employees[.]" Id. at 108.

Roe claims that supervisors would only assign Caucasian employees to perform "sham" jobs[1] processing returns and that if an African-American employee was in line in terms of seniority to

---

[1]     Processing returns was called a "sham" job because it was easier than building pallets.  Roe Dep. (Vol. I), at 43.

perform a sham job the supervisor would either leave the work unassigned or leave the job understaffed with only more senior white employees performing the work. Id. at 124-26.

Sometime during his first four years with CCE, Roe was informed of and personally observed that someone had written "KKK" and had drawn a swastika on one of the breakroom tables. Id. at 144-45. A Caucasian employee, Barry Hobbs, observed a Hispanic employee named Antonio Cruz write this graffiti and Hobbs himself erased it few minutes later. Id. at 145-46. Roe also observed that in one of the bathroom stalls someone had written, "Those niggers didn't deserve it." Id. at 149-50. Roe said that this graffiti remained on the wall for months. Id. at 151. Roe testified that around October 2001 he was informed that a Caucasian employee named John Ortman had referred to a group of African-American employees who had filed an earlier lawsuit against CCE as "greedy niggers." Id. at 166-67. Roe also heard that someone had put up a "racially-motivated" poster at the back gate, although he was not informed what the poster actually said. Id. at 173-74. Finally, Roe heard a rumor that an employee named Brad Isaacs had called Tony Wallace's wife a "nigger bitch." Id. at 217-18.

### E. Jonathon Frost

Jonathon Frost is African-American. Complaint ¶ 6. Frost began employment with CCE in April 1997 as a pallet builder

9

at the Duck Creek facility. Id. ¶ 18; Frost Dep. (Vol. I), at 30.

Frost also testified that supervisors would require African-American pallet builders to keep working but would allow Caucasian employees to stand around. Id. at 32-34. Like Robinson, Frost said that supervisors would allow Caucasian pallet builders to stand idling together but require idle African-American pallet builders to sweep the floor or pick up trash. Id. at 53-57. Frost testified that supervisors would require African-American pallet builders to produce at higher rates than Caucasian pallet builders. Id. at 38-39.

Frost stated that he was aware of racially-motivated graffiti on the walls, but that he also knew that it had been cleaned off. Id. at 57. Frost had heard about the altercation between Robinson and Kelly Schneider. Id. at 102-03.

Frost testified that he was counseled for clocking in late, but that Caucasian employees who clocked in late were not given any sort of counseling. Id. at 108; 114-117.

Frost said white employees played pranks on him. On one occasion, Frost and Caucasian employees Mike Gregory and John Pavely were on-site at a customer's location installing a $CO_2$ line. Frost climbed a ladder into the rafters to run the line. While he was on the beam with the line either Gregory or Pavely, or both, removed the ladder. Frost said that Gregory and Pavely

10

laughed at him when he asked them to replace the ladder.  Frost testified that he was stranded on the beam for at least 45 minutes.  Frost Dep. (Vol. II), at 69-73.  On another occasion, employee Tim O'Hara posted an offensive picture of an African-American woman in the vending department with the caption "Frosty's Derby Date."  Id. at 171.  Frost removed the picture himself.  Id. at 172. O'Hara and Eck Sievers also made jokes to Frost about the police looking for him.  Id. at 185-86.

O'Hara made racial insults about Frost.  O'Hara told Frost that he (Frost) "ought to come over and cut his grass." Id. at 178.  Frost testified that when they were heading to a job site, O'Hara would say that he (Frost) was going to be O'Hara's caddy.  Then, O'Hara would say, "Nope, he's going to be working in the kitchen."  Id. at 178.  O'Hara said these things in the presence of a supervisor, but Frost's supervisor said not to pay attention to them.  Id. at 179-80.

Frost was also involved in an incident with Gregory in which Gregory grabbed him around the throat, kicked him, and, screaming, called Frost "bitch" and "boy" after Frost removed a work order from Gregory's pocket.  Id. at 76-77.  Frost reported the incident to his supervisor, but he was told to go back to work and that he and Frost needed to learn how to get along.  Id. at 77-78.

11

In either 1999 or 2001, an employee named Greg Lehman called Frost a "gorilla" while they were having lunch at a restaurant.  <u>Id.</u> at 167.  According to Frost, Lehman became very aggressive and wanted to fight him.  <u>Id.</u>  Another employee who witnessed the incident, Tom Alt, reported it to supervisor Rod Cox.  <u>Id.</u> at 167-68.  Frost does not know if Lehman was ever disciplined for his behavior.  <u>Id.</u> at 168-69.

Near the time of his second deposition, African-American employee Buford Dudley told Frost that an employee named Kent Elam said to him that "he [Elam] wanted him [Dudley] to meet some of his hooded friends."  <u>Id.</u> at 184.  Frost also heard about racial epithets written on the bathroom walls.  <u>Id.</u>

## II. <u>Summary Judgment Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962).  "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly

12

supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original).  The Court will not grant summary judgment unless it is clear that a trial is unnecessary.  The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Id.</u>

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment.  <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464, 472 (1962).  "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." <u>First National Bank v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in

court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir.), <u>cert.</u>
<u>dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court
has stated that the "[s]ummary judgment procedure is properly
regarded not as a disfavored procedural shortcut, but rather as
an integral part of the Federal Rules as a whole, which are
designed to 'secure the just, speedy and inexpensive
determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 327 (1986).  According to the Supreme Court, the
standard for granting summary judgment mirrors the standard for a
directed verdict, and thus summary judgment is appropriate if the
moving party establishes that there is insufficient evidence
favoring the non-moving party for a jury to return a verdict for
that party.  <u>Id.</u> at 323; <u>Anderson</u>, 477 U.S. at 250.

    Accordingly, summary judgment is clearly proper
"against a party who fails to make a showing sufficient to
establish the existence of an element essential to the party's
case and on which that party will bear the burden of proof at
trial." <u>Celotex Corp.</u>, 477 U.S. at 322.  Significantly, the
Supreme Court also instructs that the "the plain language of Rule
56(c) mandates the entry of summary judgment, after adequate time
for discovery and upon motion" against a party who fails to make
that showing with significantly probative evidence.  <u>Id.</u>;
<u>Anderson</u>, 477 U.S. at 250.  Rule 56(e) requires the non-moving

party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. Id. Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. Analysis

As stated, Plaintiffs present hostile work environment claims pursuant to the Ohio Civil Rights Act, Ohio Rev. Code. § 4112.02, et. seq. Federal evidentiary standards and burdens of proof apply to claims of employment discrimination filed pursuant to the Ohio Civil Rights Act. Williams v. Ford Motor Co., 187 F.3d 533, 538 (6th Cir. 1999). Therefore, federal Title VII case law applies to Plaintiffs' hostile environment claims. Id.

A plaintiff establishes a hostile work environment "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Williams v. General

15

Motors Corp., 187 F.3d 553, 560 (6th Cir. 1999).  A complainant must establish that the working environment was both subjectively and objectively hostile to satisfy this requirement.  Id. at 560-61.  To establish an objectively hostile environment, one must establish that a "reasonable person in the plaintiff's position, considering all the circumstances" would find the environment hostile.  Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998) (citation and internal quotation omitted).  Accordingly, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)(internal citation and quotation marks omitted). In judging whether the plaintiff was subjected to a hostile environment, the trial court must be careful to consider the totality of the circumstances, as opposed to weighing the impact of each incident in isolation.  Williams, 187 F.3d at 562-63.

In determining whether the work environment was objectively hostile, the trial court may consider the following factors:  "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Other factors may

16

contribute to a hostile work environment.  For instance, the employer's failure to take action in response to harassing behavior may exacerbate the situation.  <u>See Slayton v. Ohio Dept. of Youth Serv.</u>, 206 F.3d 669, 678 (6th Cir. 2000) (employer's failure to take action although it was aware of employee's harassing conduct contributed to hostile atmosphere).

In arguing that the work atmosphere was not severe or pervasive as a matter of law, CCE attempts to downplay or minimize the severity of the environment Plaintiffs were exposed to by concentrating on the alleged infrequency of the conduct or the fact that in many cases Plaintiffs learned of racial graffiti and racial comments from other employees.[2]  With regard to the

---

[2]    CCE also argues that many of Plaintiffs' claims are preempted by Section 301 of Labor Management Relations Act, 29 U.S.C. § 185.  Specifically, CCE refers to Plaintiffs' testimony concerning alleged discriminatory treatment in job assignments, bumping, payment of overtime, etc., over which they filed grievances.  However, Plaintiffs' race discrimination claims are not preempted merely because CCE may have a defense to its actions resting in the collective bargaining agreement.  In <u>O'Shea v. The Detroit News</u>, 887 F.2d 683 (6th Cir. 1989), the Court stated:

> [T]he question of whether or not the plaintiff was discriminated against was separate from any possible defense the employer might have under the contract. All the plaintiff has to allege is that an action was taken against him because of a motive impermissible under the Act. It is irrelevant to the preemption question whether or not the employer can defend by showing it had the right under the collective bargaining agreement to do what it did.

<u>Id.</u> at 687.  Moreover, the incidents about which Plaintiffs testified and which touch on matters covered by the CBA are not

latter argument, however, the case law in this Circuit is very clear that evidence that the complainant learned of harassing comments, incidents, and graffiti, including the company rumor mill, contribute to a hostile work environment and may be considered by the trier of fact.  Jackson v. Quanex Corp., 191 F.3d 647, 661 (6th Cir. 1999)("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee of supervisor can impact the work environment."); Wanchik v. Great Lakes Health Plan, Inc., 6 Fed. Appx. 252, 262 (6th Cir. 2001) (crediting evidence that plaintiff heard rumors about co-workers harassing other women in assessing whether the work environment was hostile).[3]

_____

discrete claims for relief.  Rather, as the Court understands it, according to Plaintiffs, these incidents are evidence of a pattern of discriminatory conduct by CCE which considered collectively created a hostile environment.  Therefore, CCE's preemption argument is without merit.

[3]     CCE argues that under Ohio law, in order for what it calls "me too" evidence to be admissible in hostile environment cases, the plaintiff must establish: 1) that he learned of the conduct through his employment; 2) that there was a nexus between that conduct and the plaintiff's own work environment; and 3) that the conduct was reported to the employer.  The Court disagrees.  In diversity cases, federal standards control the admissibility of evidence.  Legg v. Chopra, 286 F.3d 286, 289-90 (6th Cir. 2002).  As is pertinent here, Quanex is clearly a case which delineates what evidence is relevant to establish a hostile work environment.  See Quanex, 191 F.3d at 660 ("[T]he district court committed error when it deemed irrelevant the overwhelming evidence Jackson proffered documenting discriminatory conduct towards other African-American employees at Quanex."); id. at 661 ("Comments that single out members of a protected class are relevant not only as to whether a particular work environment was objectively hostile to members of the protected class, but also

18

In this case, contrary to CCE's argument, a reasonable juror could find that, under the totality of the circumstances, each of the Plaintiffs was subject to a racially hostile environment.  The record, viewed in the light most favorable to Plaintiffs, shows that use of racial epithets by employees of CCE was a common occurrence and that Plaintiffs either personally experienced this abuse or became aware of such insults from other employees.  A factor which should be given considerable weight, even if one accepts CCE's argument that incidents of racial insults were infrequent, are employees' references to African-American employees of CCE as "niggers," "monkeys," and "gorillas."  These comments are beyond mere offensive utterances and are considered extremely severe.  Indeed, these slurs are malicious, repugnant, repellant, and extremely hurtful to African-Americans.  <u>Johnson v. United Parcel Serv., Inc.</u>, 117 Fed. Appx. 444, 454 (6th Cir. 2004); <u>White v. BFI World Serv., LLC</u>, 375 F.3d 288, 297 (8th Cir. 2004); <u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1116 (9th Cir. 2004); <u>Hrobowski v.</u>

---

as to whether an employee belonging to the protected class subjectively felt harassed."). As <u>Quanex</u> deals with relevance, it is controlling in this case. Nowhere in <u>Quanex</u> does the Court establish the restrictions on "me too" evidence advocated by CCE. In this case, for purposes of determining whether Plaintiffs' hostile environment claims withstand summary judgment only, the Court has limited its consideration of "me too" evidence to incidents which Plaintiffs became aware of during their employment with CCE.

<u>Worthington Steel Co.</u>, 358 F.3d 473, 477 (7th Cir. 2004); <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 185 (4th Cir. 2001).

Plaintiff Robinson testified that he was subjected to racial slurs on a daily basis.  He was also the victim of a racially-motivated assault by a Caucasian co-worker and witnessed the same person punch another African-American employee. Robinson also testified that African-American employees were held to different work standards and that supervisors allowed Caucasian employees to loaf while African-American employees were ordered back to work.  <u>Clay v. United Parcel Serv., Inc.</u>, _ F.3d__, No. 05-4243, 2007 WL 2457455, at *7-*8 (6th Cir. Aug. 31, 2007)(plaintiff demonstrated that harassment was based on race where supervisor criticized plaintiff for conduct for which white co-workers were not criticized).  Thus, Robinson's work atmosphere was both severe and pervasive.

Plaintiff McCoy was the victim of racial slurs.  He, too, observed that supervisors treated African-American employees differently from Caucasian employees with respect to idling on the work floor.  McCoy was also the victim of pranks perpetrated by his supervisor which a reasonable juror could find were racially motivated.  McCoy's testimony suggested that some work areas seemed to be segregated by race.  <u>See</u> <u>Jordan v. City of Cleveland</u>, 464 F.3d 584, 597 (6th Cir. 2006)(plaintiff experienced racially hostile environment where, in part, work

shifts were racially segregated).  McCoy was also aware of racial graffiti and heard that managers and supervisors used racial slurs in meetings.

Dante Roe also witnessed supervisors treated African-American employees and Caucasian employees differently with respect to work assignments.  He also observed that African-Americans were disciplined more harshly than Caucasian employees with regard to rules infractions.  Roe was aware of racial slurs made by a supervisor and heard about and personally observed racial graffiti, some of which, he testified, remained on the walls for months.  Roe also heard that a racially-motivated poster was displayed at the back gate.

Plaintiff Frost also saw supervisors treated African-American employees and Caucasian employees differently with respect to idle time and disciplinary actions.  Frost heard about racial graffiti in the restroom, although he knew that it had been removed, and was aware of the altercation between Plaintiff Robinson and Schneider.  Frost was aware of racial comments made by a white employee to another African-American employee.  Frost was the victim of an apparently racially-motivated assault by a co-worker and was the victim of a prank by the same person which one could conclude was also racially motivated.  The "Frosty's Derby Date" prank was racially-motivated.  Frost was physically

threatened by another co-worker.  Other employees made racially derogatory remarks to Frost, including calling him a "gorilla."

Plaintiff Thiam's work environment presents the closest question.  Nevertheless, a reasonable juror could find that his work environment was objectively hostile as well.  Thiam said that supervisors would treat African-American employees more rudely than Caucasian employees.  Thiam's supervisor called him "lazy black bastard" and made a comment about the complexion of his skin.[4]  Thiam was aware of racist graffiti, including "nigger" and "KKK," on the bathroom walls and he had heard that a supervisor had threatened retaliation against another African-American employee for complaining about discrimination.

In sum, each of the Plaintiff's has adduced evidence sufficient for a juror to conclude that his work environment was objectively hostile.

CCE argues, however, that even if Plaintiffs were subjected to a hostile work environment, it is entitled to

---

[4]     Although Thiam and his supervisor were the same race, the supervisor's comments still contributed to and should be considered a part of the racially hostile environment.  See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 76 (1998)("[I]n the related context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race. Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.")(quoting Castaneda v. Partida, 430 U.S. 482, 499 (1977)).

22

summary judgment on its affirmative defense.  In <u>Jackson</u>, the

Court explained the employer's affirmative defense where no

tangible employment action occurred as a result of the hostile

work environment:

> As we explained earlier, an employer is vicariously
> liable for an actionable hostile work environment
> created by a supervisor with immediate (or successively
> higher) authority over the employee.  Where, as here,
> no tangible employment action is taken, an employer may
> raise an affirmative defense to liability by proving,
> by a preponderance of the evidence, that (1) it
> exercised reasonable care to prevent and correct
> promptly any racially harassing behavior, and (2) the
> plaintiff employee unreasonably failed to take
> advantage of corrective opportunities provided by the
> employer. As for the acts of co-workers, a plaintiff
> may hold an employer directly liable if she can show
> that the employer knew or should have known of the
> conduct, and that its response manifested indifference
> or unreasonableness.  Significantly, a court must judge
> the appropriateness of a response by the frequency and
> severity of the alleged harassment. Generally, a
> response is adequate if it is reasonably calculated to
> end the harassment.

<u>Jackson</u>, 191 F.3d at 663 (internal citations and quotation marks

omitted).  Moreover,

> when the allegations of [racial] harassment involve a
> coworker and the employer has fashioned a response, the
> employer will only be liable if its response manifests
> indifference or unreasonableness in light of the facts
> the employer knew or should have known. The act of
> discrimination by the employer in such a case is not
> the harassment, but rather the inappropriate response
> to the charges of harassment.  Thus, an employer who
> implements a remedy can be liable for [race]
> discrimination in violation of Title VII only if that
> remedy exhibits such indifference as to indicate an
> attitude of permissiveness that amounts to
> discrimination.

McCombs v. Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005)
(internal citation omitted).

        In support of its affirmative defense, CCE contends
that it established strong anti-discrimination policies and that
Plaintiffs unreasonably failed to take advantage of these
policies by not making timely complaints.  CCE further argues
that the evidence shows that it responded effectively to
complaints of harassment.  The Court, however, agrees with
Plaintiffs that a fact question remains whether CCE's anti-
discrimination policies are effective and whether CCE acted
promptly to correct harassing behavior.

        In reaching this conclusion, initially the Court notes
that CCE's internal management communications reflect that it was
aware of racial animus within its organization, that it was
having difficulty coming to grips with racism among its employees
and supervisors, and that it had not responded adequately to the
problem in the past.  In an April 26, 1999 memorandum, Kevin
Johnson, Human Resources Manager for the Duck Creek and Wilmer
Avenue facilities, wrote the following to Thomasina Kennedy,
CCE's Human Resources Director at the time:

            This letter is a follow-up on our meeting last week
            around the diversity opportunities and fundamental
            training for supervisors here in Cincinnati and in the
            Ohio/Kentucky division.  Tommie, the diversity issue
            has so many different angles and opportunities, I think
            we need to start at the top of the organization and ask
            ourselves 1, Have we identified and prioritized the
            critical issues within the organization and diversity

24

itself? 2, Does our management team have a fundamental understanding of racism, diversity, and the issues with training and how it impacts the business?  I personally feel that we as the leaders do not have a basic understanding of the above mentioned topics, how can we expect the rank and file supervisors to understand, follow, and become role models.  My recommendation would be to have a second meeting or individual meetings with the Area Managers and discuss these topics before implementing.  There were a lot of issues we surfaced in our meeting, but there may be some things that we did not identify that need some attention.

. . .

Structure:

I. Problem Statement: It is very apparent that there are several issues surrounding a need for education in the area of racism, diversity, and fundamental training for supervisors and key roles in the organization. Although the pulse has improved in the warehouse, the climate continues to be as such that it shows strong indicators that the workforce is tense and still has signs of disparate treatment.  It is important to point out that a portion of that tension is coming from the supervisory level and there [sic] knowledge in how to handle confrontational issues (i.e. sexual innuendos, racial slurs, and decisions that adversely impact women and minority's [sic]) as well as defuse situations, and to understand employees who come from a diverse background.  This is also an issue facility wide.

II. Root Causes: Frozen Mindset [sic] from supervisors and management in regards to minority's [sic] and individuals from lower socio-economic class only have the ability to only perform functions such as administrative duties and laborious work.  The acceptance of past management decision [sic] that have been less than acceptable, around employee related issues as well perception [sic] that this environment has the "good ol' boy connection."  The lack of communicating zero tolerance, and educating supervisory team on the tools that are needed to run the business, and the impact it will have on the organization as a whole.

25

III. Corrective Actions: Human Resources does not wear the burden of fixing this issue.  Identify that this issue is bigger than the warehouse.  We need total buy in and leadership from the top the organization to help fix the problem and minimize future pitfalls.  They can also serve as role models.  The remedy is that all departments must pitch in to help solve.  Since the settlement we have completed the following:

A. Severed the old warehouse manager and replaced him with a more seasoned individual in the area of supervisory training, conflict resolution, tension diffusion.

. . .

B. Conducted an assessment of the remaining supervisors Carl North, Chuck Peasley, Russ Lehman, and Ken Hisel. In this assessment the decision was to keep these gentlemen on board and to train the individuals.  We take ownership that there is/was a huge opportunity for training these supervisors that may have been missed in the past.

. . .

C.  Human Resources is diligently interviewing for an Employee Relations position in the operation department to provide the employees with HR representation.  That person will be in place in July 99.  Conducted A.A.P. overview for department managers.  HR has also met with the Branch Manager and Director of Ops to role out the affirmative action plan for Cincinnati.  NOTE: The comment was "This was the first time this has been presented to them."

Doc. No. 60, Ex. I.

CCE attempts to diminish the importance of this memorandum by arguing that it shows that it took steps to improve the work environment.  While that much is true, this memorandum corroborates several points central to Plaintiffs' claims.  First and most importantly, the memorandum demonstrates recognition by

26

CCE that there was racial tension and disparate treatment of minority employees in its warehouse, supporting Plaintiffs' claims that they were forced to work in a racially hostile environment.  Second, the memorandum implicitly recognizes that some of the supervisors about whom Plaintiffs now complain, specifically Carl North, Chuck Peasley, and Russ Lehman, were responsible for creating or contributing to the hostile work environment.

Although according to the documentation submitted by CCE it has conducted and implemented a number of programs to address discrimination, see Doc. No. 81, Exs. A-L, Plaintiffs have adduced evidence that CCE's response to workplace harassment has been ineffectual.  In any event, however, the mere existence of anti-discrimination policies does not conclusively establish that the employer acted reasonably in remedying the harassment or preventing its recurrence.  Cerros v. Steel Tech., Inc., 398 F.3d 944, 953 (7th Cir. 2005).

Although CCE eventually took some measures to combat graffiti, such as laminating table tops and installing stainless steel bathroom stalls, a reasonable juror could find that these measures were slow in coming.  For instance, the table tops were not laminated until 2005.  Doc. No. 60, Ex. C.  Supervisor Chuck Peasley testified that graffiti would be painted over when it appeared on the walls, Peasley Dep. (Vol. I), at 30-31, but Roe

stated that the racial graffiti he observed remained on a bathroom stall for months.  Plaintiffs submitted the affidavits of other employees dated in 2005 who witnessed graffiti and other racially offensive materials and stated that it was a recurring problem despite their reports and complaints.[5]  See Jackson, 191 F.3d at 663 (employer failed to prove affirmative defense where it was "slow to eliminate racial graffiti when it learned of it and made no effort to discover the perpetrators."); see McGinest, 360 F.3d at 1120 ("[A]lthough painting over the graffiti was a necessary first step, the record before us reveals no actions taken by GTE to ensure that this recurrent problem would cease[.]").

Similarly, although there was an investigation into the racially offensive poster found in the back gate, it only consisted of taking statements of employees.  No conclusions were reached about the responsible person and apparently no discipline was meted out.  Doc. No. 73, Ex. D.  The investigation into the racial slur directed at Anthony Wallace's wife was in the end inconclusive.  Id. Ex. E.[6]  Investigations into allegations of

---

[5]    See Doc. No. 60, Ex. B, Denson Aff. ¶ 5; Famble Aff. ¶ 17; Grant Aff. ¶ 14; Harding Aff. ¶ 7; McCullough Aff. ¶¶ 5-6; McCrary Aff. ¶ 5; McGee Aff. ¶¶ 5-7; Morgan Aff. ¶ 4; Rasheed Aff. ¶ 12; Riley Aff. ¶ 10; Simmons Aff. ¶¶ 5, 9; Simpson Aff. ¶¶ 8-10; Smith Aff. ¶ 5; Spencer Aff. ¶ 9; Amadou Thiam ¶ 5; Thomas Aff. ¶ 5; Worthen Aff. ¶¶ 7, 9.

[6]    CCE originally charged and suspended a Caucasian employee named Brad Isaacs for this incident.  Isaacs grieved the

racial slurs simply resulted in denials by the accused employee
with no further attempt to confirm or dispel the charge. See Doc.
No. 57, Ex. H; Ex. I; Ex. J.; Ex. K.  According to Frost, his
supervisor did nothing when he complained about Mike Gregory
grabbing him and kicking him.

It is instructive to consider the employer's actions to
remedy incidents of sexual harassment in Scarberry v. ExxonMobil
Oil Corp., 328 F.3d 1255 (10th Cir. 2003), which the Court found
were adequate as a matter of law.  In response to harassing
graffiti, the human resources director:

> (1) personally viewed the graffiti; (2) took pictures
> of the graffiti so that he could investigate the
> handwriting; (3) authorized the graffiti's immediate
> removal; (4) began interviewing employees and security
> guards to determine who could be a suspect; and (5)
> began interviewing employees who had been targeted as
> suspects. During the following weeks, he also (6)
> collected numerous writing samples from the suspects'
> employee records and compared them with the graffiti
> (7) reviewed the plant's security system surveillance
> tapes; (8) reviewed trucking logs of outside
> contractors who were on the premises during the
> relevant period; (9) attempted to identify a forensic
> handwriting expert; (10) contacted headquarters seeking
> additional assistance; (11) learned that Mr. Gwin, a
> security adviser, had been assigned to the case from
> headquarters; and (12) alerted "security to be more
> aware of potential problems at the plant."

Id. at 1257-58.  Additionally, the employer did the following:

---

suspension and the arbitrator concluded that although the
incident occurred, both CCE and the victim, Mrs. Wallace,
erroneously identified Isaacs as the perpetrator.  The arbitrator
ruled that CCE lacked just cause to suspend Isaacs and ordered
that he be made whole.  Id. Ex. F.

ExxonMobil's head of security at the plant called
police immediately after the second graffiti incident,
and Gwin arrived at the plant within two days.
ExxonMobil took pictures of the graffiti and then
immediately began removing it. That same evening, Mike
Townsend, the operations manager, grouped his section
leaders and asked them who they thought could be
responsible for the graffiti, and started bringing
individuals in for questioning.

. . .

Over the following three days, ExxonMobil required all
employees to attend meetings in which the plant manager
reiterated and demanded compliance with the sexual
harassment policy as found in the "Employee Matters
Policy." In the following weeks, the record shows that,
among other things, ExxonMobil beefed up security at
the plant, fixed and upgraded lights, surveillance
cameras, and fences, and increased the number of
security guards. Within eleven days, Gwin had
identified employee Terry Simpson's handwriting
exemplars as being similar to the graffiti, noted that
he had been on temporary work assignment in proximity
to Scarberry and the other woman named in the graffiti,
and named him as a suspect.  He sent the samples to a
handwriting analyst for confirmation, and the analyst
returned his report on September 18. The report stated
that it was "highly probable" that Simpson was the
culprit. Simpson was terminated on October 3. There
were no subsequent incidents involving graffiti.

Id. at 1258.

In response to complaints concerning individuals

allegedly responsible for harassment, one employee was counseled

that the employer would not tolerate harassment or retaliation.

The warning was sufficient to stop the harassment.  Id. at 1259.

The employer was not able to corroborate the allegations against

a second employee, but reiterated its policies to the employee

and warned him that his activities would be monitored more

closely.  Id. at 1260.  A third employee received a three day
suspension for his behavior, was required to apologize in writing
and in person to the plaintiff, and was warned that future
incidents could result in termination.  Id. at 1261.

The employer in Scarberry acted swiftly and
aggressively, sparing virtually no effort in rooting out the
perpetrator of harassing graffiti.  Discipline was meted out
quickly.  Even where the results of its investigation were
inconclusive, the employer warned the suspected employee that he
would be watched more closely.  While this Court does not hold
that every employer needs to take the extraordinary actions of
the employer in Scarberry in response to workplace harassment,
certainly the comparison, viewing the evidence in the light most
favorable to Plaintiffs, leaves room for a reasonable person to
conclude that CCE's response to harassment was inadequate.  As
indicated, graffiti appears to have been a recurrent problem, but
CCE made no sustained effort to identify the perpetrators.
Moreover, according to Roe, and others, graffiti remained in
place for months.  Although CCE investigated incidents of alleged
harassment, it appeared willing to cease its remedial efforts
after reaching inconclusive results or receiving flat denials of
improper conduct from the alleged harasser.  E.g., Doc. No. 60,
Ex. C. ("There was some graffiti carved into two break room
tables in the production lunchroom, the Company investigated but

31

could not discover who was responsible."); Doc. No. 73, Exs. B, D, K, L; <u>Pollard v. E.I. DuPont de Nemours Co.</u>, 213 F.3d 933, 942-43 (6th Cir. 2000), <u>rev'd on other grounds</u>, 532 U.S. 843 (2001)(employer failed to make good faith effort to remedy harassment where "management interviewed the members of 'A' shift with a list of yes-or-no questions, and when they responded 'no' to the question concerning knowledge about the event, the interviews were concluded."). In some instances, supervisors did nothing to correct harassing conduct even though it occurred in their presence. <u>See</u> <u>infra</u> at 11-12; <u>see also</u> Doc. No. 73, Ex. J.[7] In short a juror could find that CCE is not entitled to judgment on its affirmative defense.

Although CCE argues that Plaintiffs unreasonably failed to utilize the complaint procedures in place, Plaintiffs submitted ample evidence that the work atmosphere was so severe and pervasive that CCE had constructive notice of it. <u>Jackson</u>, 191 F.3d at 663; <u>Wanchik</u>, 6 Fed. Appx. at 264-65; Doc. No. 60 Ex. B; <u>see</u> <u>infra</u>, at 28 n.5. Indeed, as the memorandum quoted above

---

[7] This is a written report from Steve Kleier concerning a May 2002 incident in which an employee named Chris Mahyer, who apparently was Caucasian, left work early after having an argument with an African-American employee named Lonnie Waters. Mahyer became angry after Waters accused him of refusing to show Waters the shift average because Waters was black. In Kleier's words: "He [Mahyer] said I have had enough I'm leaving, and as he started to walk away he said, you better get control of that Niger [sic]. I did not respond and went back in to [sic] the building and back upstairs."

32

establishes, CCE's management was aware of racial tension within its organization.  Moreover, at this point, given there is a jury question whether CCE exercised reasonable care in preventing and correcting workplace harassment, it is immaterial whether Plaintiffs unreasonably failed to take advantage of complaint procedures.  Clark v. United Parcel Serv., Inc., 400 F.3d 341, 351 (6th Cir. 2005)("Because UPS must prove both prong one and prong two of the defense to invoke it, we decline to decide whether UPS proved prong two by showing that Knoop and Clark unreasonably failed to take advantage of any complaint procedures.").

<u>Conclusion</u>

In conclusion, a reasonable juror could find that each of the Plaintiffs was subjected to a racially hostile work environment.  A reasonable juror could also find that Defendant is not entitled to judgment on its affirmative defense to Plaintiffs' hostile environment claims.

Accordingly, Defendant's motions for summary judgment are not well-taken and are **DENIED.**


**IT IS SO ORDERED**

Date___October 9, 2007_____        _____s/Sandra S. Beckwith_____
                                     Sandra S. Beckwith, Chief Judge
                                     United States District Court

33